# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JURRIAAN STROBOS,

    Plaintiff,

        v.

RXBIO, INC.,

    Defendant.

Civil Action No. 15-1994 (JEB)

## MEMORANDUM OPINION

You don't need to be a venture capitalist to know that an early investment in the development of a new drug may never pay off. Plaintiff Jurriaan Strobos, though, claims that he was stricken with more than a bad bet when Defendant RxBio, Inc., shortchanged him nearly $700,000 for his work on developing its flagship drug. The Company, in turn, acknowledges that it came down with a nasty case of the financial woes in 2014, but rejoins that it was Strobos who violated his employment contract and disclosed certain of its trade secrets.

Both parties, hoping for a swift tonic to these alleged ills, now cross-move for summary judgment on all counts. As the Court concludes that factual findings are needed to put many of their maladies to rest, it will largely deny both Motions.

## I.    Background

Because the Court is dealing with Cross-Motions, it cannot set forth the facts in the light most favorable to the non-moving party. Instead, it will offer only the undisputed background to this squabble and then detail specific relevant facts within the corresponding analysis subsections. It also provides a procedural history of the litigation here in a separate section.

A. Employment and Resignation

Defendant is an early-stage Tennessee company that is developing a drug – Rx100 – to prevent and treat acute radiation syndrome. See ECF No. 38 (RxBio Statement of Issues) (SOI), ¶ 2. On October 1, 2011, its President and CEO, W. Shannon McCool, verbally agreed to finalize the hiring of Plaintiff as its sole Vice President. Id., ¶¶ 4-5. A trained medical doctor and lawyer, Strobos brought with him particular expertise in navigating the regulatory gantlet required for the approval of new drugs. Id., ¶ 1.

It was no coincidence, then, that he officially came on board just days after the Company secured an important three-year deal to develop Rx100 with the financial assistance of the U.S. Biomedical Advanced Research Development Authority (BARDA). Id., ¶¶ 19-21. In fact, RxBio's "decision to hire [him], as well as the amount of [his] salary," was directly tied to this deal, and the Company's initial pitch to the federal agency "included proposed labor costs for [him] at a rate of $385,000 per year." ECF No. 47-1 (Strobos SOI), ¶ 34. By the contract's terms, moreover, RxBio had to track the time that Strobos worked on the development of Rx100 and submit this log to BARDA for monthly reimbursements. See RxBio SOI, ¶ 21; ECF 47-2 (Deposition of W. Shannon McCool) at 16:1-12.

This arrangement worked well for more than two years. In January 2014, though, a government audit flagged concerns about RxBio. See RxBio SOI, ¶¶ 35-37. BARDA immediately began withholding its monthly checks in response. Id. Forced to turn its microscopes inward, the Company soon realized that it had another potential problem with its books – namely, it did not have a current employment contract for Strobos (or other top executives). Id., ¶ 38. Plaintiff and Defendant quickly executed an agreement in mid-2014 with

an effective date relating back to start of his tenure in October 2011. See RxBio SOI, ¶ 38; ECF No. 11-1, Exh. B (2014 Employment Contract).

Two months later, the government's pause on the Rx100 project became more permanent when BARDA let its contract expire without exercising a lucrative option. See RxBio SOI, ¶¶ 39-40. This decision left Defendant in a serious financial bind as the agency was still withholding its earlier reimbursements. Id., ¶ 40. CEO McCool and his brother, who served as RxBio's Chief Information Officer, consequently decided to slash their annual salaries in order to keep the project moving forward over the course of 2014. See Strobos SOI, ¶¶ 54-55.

Unfortunately, more bad news was just around the bend. In mid-2014, an independent study at the University of Maryland failed to show Rx100 effective for use in non-human primates. See RxBio SOI, ¶¶ 51-52. With its flagship project now in serious peril, Strobos, McCool, and others at RxBio agreed to review the study for potential design defects. Id., ¶ 52; see also ECF No. 23-6 (Deposition of Gabor Tigyi) at 43:10-44:3. Strobos, in particular, discussed possible issues with the study's rehydration of its test animals with two outside clinicians: Dr. Nisha Chandra-Strobos, his wife and a well-regarded clinician in her own right, and Dr. William Greenough, an expert in diarrheal medicine. See RxBio SOI, ¶¶ 52-55.

By the fall of 2014, however, the Company was still in rather dire financial straits. With no other options on the table, in September, Strobos and McCool resolved to make additional spending cuts. See Strobos SOI, ¶ 59. More specifically, the men agreed that RxBio would no longer pay Strobos – its highest paid employee at the time at $385,000 – his full salary each month. See id., ¶¶ 59-60; RxBio SOI, ¶¶ 43-44; ECF No. 41-1 (Declaration of W. Shannon McCool), ¶ 53. The Company began instead to pay him at a rate of $20,000 per month and accrued the unpaid portions of his original salary and any bonuses on its books. See RxBio SOI,

¶¶ 43-44; ECF No. 11 (Amended Counterclaim), ¶¶ 24-25. Then, in November, Strobos and McCool again agreed verbally to reduce this monthly check further still, while they also coordinated similar sacrifices from other RxBio employees. See RxBio SOI, ¶¶ 13, 46-49; Strobos SOI, ¶¶ 64-68, 76.

As the months ticked by under the Company's obvious financial strain, the relationship between Strobos and McCool rapidly deteriorated. By early 2015, the two seem to have come to a particularly contentious stalemate over the Company's potential pursuit of animal-modeling projects. See Strobos SOI, ¶¶ 113-16. Animal modeling involves the design of studies that use animals as test subjects "to demonstrate, among other things, the efficacy of [drugs] in animals [as] satisfactorily predictive for use with humans." Id., ¶ 17. Strobos, for his part, felt that a separate entity should be formed to handle this work, while McCool thought the endeavour properly housed within RxBio's existing research framework. Id., ¶¶ 113-16.

On July 3, 2015, this disagreement reached a boiling point when the two men debated the issue over the phone. Id., ¶¶ 114-18. During this conversation, Strobos expressed that the animal-modeling endeavor would be much better off if he could solicit funding from BARDA directly in a new venture so as to avoid any residual RxBio "baggage" from the ill-fated Rx100 deal. Id. This message was not well received by McCool, who began to question Strobos's loyalty to the Company. See McCool Dep. at 139:25-140:9.

As a result of what Strobos then perceived to be actions taken by McCool to sideline his influence and authority, Plaintiff resigned from the Company just two weeks later on July 17, 2015. See Strobos SOI, ¶ 214; RxBio SOI, ¶ 71.

B.  Procedural History

Four months thereafter, Strobos brought this suit seeking to recover nearly $700,000 in expenses, salary, bonuses, and severance that he claimed RxBio unjustly refused to pay him.  See ECF No. 1 (Complaint),  ¶¶ 31-36, 41.  In Count I for breach of contract, he asked for several types of damages: the funds that Defendant had accrued on its books as his salary and bonuses, certain costs that he had fronted the Company during his tenure, and a large severance payment provided for in his 2014 Employment Contract.  Id., ¶¶ 37-41.  He further alleged, in Count II, that RxBio's failure to pay his full salary and bonuses on at least a monthly schedule violated the D.C. Wage Payment and Collection Law.  Id., ¶¶ 42-47.  Defendant, in response, denied all his claims and pressed four counterclaims of its own, alleging: (1) Strobos breached his contract "by failing to devote his full-time attention to his employment with RxBio"; (2) he breached his contract "by failing to return all RxBio records . . . to RxBio on the date of his termination"; (3) a further breach occurred via his "fail[ure] to keep RxBio promptly and fully informed of the identity and nature of any current or subsequent entity or individual" for whom he later worked; and (4) Strobos violated his contract and the Tennessee Uniform Trade Secrets Act by delivering RxBio's "trade secrets to third parties without such third parties entering into non-disclosure agreements with RxBio."  Am. Counterclaim, ¶¶ 61, 65, 69, 75.

Before the current summary-judgment briefing could be completed, BARDA released at least some of the reimbursements that it had been withholding.  See RxBio SOI, ¶ 83.  Strobos then moved for a preliminary injunction to freeze the portion of that money that he believed to be his unpaid salary, and the Company counter-moved to freeze his assets to pay potential damages on its counterclaims.  See ECF Nos. 25, 32.  After a hearing on December 16, 2016, the Court

denied relief to both in a written Memorandum Opinion and Order. Strobos v. RxBio, Inc., 2016 WL 7442644 (D.D.C. Dec. 27, 2016).

Now, the parties have finished their briefs cross-moving for summary judgment on all counts in both the Complaint and Counterclaim. In other words, they each seek an affirmative judgment on their own claims, as well as a rejection of their adversary's counts. See ECF No. 23 (Motion); ECF No. 44 (Cross-Motion). Those Motions are now ripe.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "Evidence that is 'merely colorable' or 'not significantly probative' is insufficient." Chambers v. Burwell, 824 F.3d 141, 145 (D.C. Cir. 2016) (quoting Liberty Lobby, Inc., 477 U.S. at 249–50). The nonmovant must instead provide evidence that would permit a reasonable jury to find in its favor. See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III. Analysis

For a relatively confined contractual dispute, the record here is extensive. This is not entirely surprising given that the parties vigorously (and often needlessly) contest every fathomable facet of the circumstances that led to their dispute, including issues seemingly irrelevant to their causes of action.

To untangle these conflicting tales, the Court finds it best to start with the pure breach-of-contract claims pressed by RxBio, then moves on to its mixed contract/statutory count, and wraps up with the causes of action asserted by Strobos.

### A. RxBio's Breach-of-Contract Claims

The Company asserts three causes of action that rely purely on a breach-of-contract theory (Counterclaims I-III). According to RxBio, Strobos violated specific provisions in his employment contract when he failed: 1) "to return RxBio's Property" to it immediately after his resignation; 2) "to promptly inform RxBio of [his] subsequent employers"; and 3) "to devote his full time and attention" to the Company during his employment. See Cross-Mot. at 15-20. The Court addresses the first two assertions together, as they share a common deficiency, and then proceeds to the third.

1. *Return of Property & Notification (Counterclaims II & III)*

To successfully press its first two breach-of-contract claims, the Company must offer some evidence that Strobos's alleged actions in violation of his employment agreement actually damaged it. The precise nature of the factual allegations upon which it hopes to hang this showing is not entirely clear. As to the return-of-property count, it first points to a provision in the 2014 Employment Contract that required Strobos, upon his termination, to return all its records and not retain the originals or copies of any such documents. Id. at 18. It next cites to statements Strobos's counsel made during discovery in this litigation about how best to turn over certain copies of emails that Strobos had retained to litigate this case. Id. at 18-20 (identifying records turned over in March 2016 and general statements in SOI that Strobos "did return all information to RxBio, and to the extent he retained electronic copies of such data, he was required to do so because of this pending action") (emphasis omitted). As to the count about his subsequent employers, RxBio likewise only vaguely and briefly asserts that Strobos has not disclosed any employers since his resignation and speculates that unidentified ones might exist. Id. at 20-21. Critically, with regard to both claims, RxBio never advances any clear theory of how it was damaged by these actions; in fact, as Plaintiff demonstrates, none seems to exist. Strobos thus secures summary judgment on these counts.

Reaching this conclusion requires little explication. The employment contract between RxBio and Strobos contains a choice-of-law provision electing Tennessee law. See 2014 Employment Contract, art. XVIII at 6. Under that law, proof of damages is an essential element of a breach-of-contract claim. Custom Built Homes v. G.S. Hinsen Co., Inc., 1998 WL 960287, at *3 (Tenn. Ct. App. Feb. 6, 1998). A defending party is thus entitled to summary judgment on such a claim if it can show that the complainant has failed to adduce evidence that it incurred

damages from any alleged breach. Union Planters Bank of Middle Tenn. v. Choate, 2000 WL 1231383, at *3 (Tenn. Ct. App. Aug. 31, 2000).

Strobos does just that. As he points out, the Company never offers any evidence of an injury that it suffered as a result of either his alleged delay in returning a computer or documents to it until after discovery started or by his failure to notify it of possible subsequent employers. See Mot. at 22 ("RxBio has no actual monetary damages."); id. at 28 (RxBio "has not suffered any damages or irreparable harm" from delay in turning over property); see also FRCP 56(c)(1)(B). The Company, confronted with this deficiency, directs the Court to nothing in the record to establish any such damages. RxBio instead merely "requests that the Court reserve the issue of its damages for trial." Cross-Mot. at 1; ECF No. 50 (RxBio Reply) at 15 (reiterating its desire that the Court "reserv[e] the issue of damages for trial"). It has thus pointed to no evidence at this stage in the litigation to support an essential element of these two claims.

This is not particularly surprising given that it is unclear how the Company could have been harmed by the specific actions alleged here – i.e., retention of unspecified emails turned over pursuant to discovery, a month's delay in returning a computer, the retention of an image of that computer's hard drive, a related external hard-drive, and certain emails for the purposes of this litigation, or the identification of speculative clients that Strobos might have worked for since resigning. See Cross-Mot. at 18-21; RxBio Reply at 15-21. In particular, Strobos is plainly entitled to have access to the record for this case, and the Company is not damaged in any legally cognizable way as a result. If it fears that he might share anything found in the record with a third party, moreover, it may seek a protective order to avoid any such action.

To the extent that it believes damages might exist, the Company, of course, bore the burden of connecting them to these counts. It is not the role of the Court to drum up a

hypothetical theory of damages by digging through the factual briefing or record on its own. See SEC v. e-Smart Techs., Inc., 85 F. Supp. 3d 300, 308 (D.D.C. 2015) ("[J]udges 'are not like pigs, hunting for truffles buried in briefs' or the record.") (quoting Potter v. District of Columbia, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring)). According to Tennessee law, moreover, "[d]amages may never be based on mere conjecture or speculation." Rye v. Women's Care Ctr. of Memphis, MPLLC, 477 S.W.3d 235, 267 (Tenn. 2015) (quoting Overstreet v. Shoney's Inc., 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999)).

As RxBio has not established the essential damages element of its claims, the Court must conclude that Strobos is entitled to summary judgment as to its first two breach-of-contract counts.

### 2. Full Time and Attention (Counterclaim I)

The evidence supporting the Company's third breach-of-contract claim is considerably more robust than that relating to its first two. According to RxBio, at some point after it ceased paying Strobos's wages in full, he stopped devoting his full time and attention to its mission. This, it contends, violated the term in his contract providing:

> [Strobos] shall devote [his] full time and attention to [his] employment with [RxBio] during [RxBio's] normal business hours. That notwithstanding, [he] acknowledges that job performance and/or unforeseen time demands may from time to time require [him] to work before and/or after normal business hours to accomplish project deadlines and/or respond to various other circumstances. [Strobos] understands and agrees that [RxBio] has an expectation and requirement that [he] will devote a minimum of 1880 hours per year in the performance of [his] duties as an employee of [RxBio] and that [he] will keep, maintain, and weekly submit time logs that accurately reflect time spent on the job.

2014 Employment Contract, art. II, § 1.2 at 1. As a result, RxBio claims that it is entitled to the "difference between the wages paid to Dr. Strobos and the wages that should have been paid to

Dr. Strobos based on his devotion of less than full-time attention to his work for RxBio." Am. Counterclaim, ¶ 62; see also McCool Decl., ¶¶ 24-25.

To advance this breach-of-contract claim under Tennessee law, the Company must show "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." Custom Built Homes, 1998 WL 960287, at *3. Neither party disputes that the first element is satisfied here, nor that the 2014 Employment Contract is the pertinent agreement. The third, as well, presents little trouble as the Company identifies the obvious source of its damages this time around – i.e., the difference between what it paid and what it received.

All the action on this count thus revolves around the second element. The parties' affidavits, not surprisingly, do not tell the same tale. For its part, the Company points to two declarations from Strobos's colleagues, who say that he told them toward the end of his tenure that he was no longer able to devote his full attention to the Company's mission. See Am. Counterclaim, Exh. D (Declaration of Karim Emmons Thompson) & Exh. E (Declaration of Alyssa Boler). McCool likewise testified that he found Strobos to be unavailable at times in mid-2015, though he could not pinpoint any precise example of when this occurred. See McCool Dep. at 180:5-9, 181:11-21. In rebuttal, however, Strobos insists that he devoted total effort to the job and never told anyone at the Company that he could not work full-time. See ECF No. 49, Exh. 1 (Supplemental Declaration of Jurrian Strobos), ¶ 3. He further points out that the Company acknowledged as much when it billed the federal government for his work. See Mot. at 24-25; RxBio SOI, ¶¶ 80-82.

These sparring factual positions cannot be resolved at summary judgment. Czekalski, 475 F.3d at 363 (courts must "eschew making credibility determinations or weighing the

evidence" at summary judgment).  It is not the role of the Court to determine, based on which side's evidence seems more credible, whether Strobos did or did not shirk some of his duties at the Company toward the end of his tenure.  Id.  This is for the jury to decide at trial.  As a result, both Motions must be denied as to this claim.

B.  Contract/Statutory Claim (Counterclaim IV)

Finally, the Company alleges in one combined count that Strobos violated his contract and the Tennessee Uniform Trade Secrets Act when he wrongfully disclosed RxBio's trade secrets to outsiders.  The relevant provision in his employment agreement specifically provides:

> [Strobos] agrees that except in the performance of his duties hereunder, or with the express written permission of the board of directors of [RxBio, he] shall not . . . , directly or indirectly, reveal, divulge or make known to any person or use for the benefit of any person other than [RxBio], any non-public, proprietary or confidential information, intellectual property, know-how, or trade secrets that he has learned, or may learn, as a result of his association with [RxBio]. . . .

2014 Employment Contract, art. XII, § 12.1, at 3 (emphasis added).  According to the Company, Strobos broke this promise when he spoke with two outside clinicians – as a reminder, Dr. Chandra-Strobos (his wife) and Dr. Greenough (a diarrheal expert) – about Rx100 and potential flaws in the design of the adverse Maryland study without first securing nondisclosure agreements from them.  See Cross-Mot. at 22-23.  RxBio further asserts that the same facts constitute a misappropriation of trade secrets under TUTSA.  Id.  For ease of reference, the Court separately identifies the flaws in each of these claims.

1. *Breach of Contract*

As should be plain, the provision cited by the Company does not universally prohibit Strobos from sharing confidential information.  Rather, it states that he may not do so "except in the performance of his duties hereunder."  2014 Employment Contract, art. XII, § 12.1, at 3

(emphasis added). To show that he transgressed this commitment, the Company must therefore adduce evidence not only that Strobos passed on this type of information, but also that he did so outside of the confines of his RxBio obligations.

This is a showing the Defendant does not make. Indeed, after quoting the relevant contract provision, RxBio never explains how Strobos's actions breached the deal beyond a conclusory statement that he "repeatedly divulged information to Nisha Strobos, Dr. Greenough, and possibly others, thereby breaching 2011 Agreement." Cross-Mot. at 22. Even more problematic, in its Reply, RxBio only refers to a contract theory of this count in passing on the first page of its brief, apparently abandoning this version of the claim altogether. See RxBio Reply at 21-22. This omission alone is sufficient ground for the Court to grant summary judgment for Strobos as to this iteration of the count. See Baptist Mem'l Hosp.-Golden Triangle v. Leavitt, 536 F. Supp. 2d 25, 40 (D.D.C. 2008) ("A party that fails to refute an opposing party's argument on Summary Judgment may be found to have conceded the point."), aff'd sub nom. Baptist Mem'l Hosp.-Golden Triangle v. Sebelius, 566 F.3d 226 (D.C. Cir. 2009).

The record on the other side of the ledger, moreover, is replete with evidence that Strobos held these discussions in furtherance of his RxBio duties. CEO McCool, in fact, repeatedly admitted that he knew that Strobos was seeking this external help on various issues related to the Company's work. See RxBio SOI, ¶ 53; see also McCool Dep. at 48:8-49:13 (conceding knowledge Strobos and Tigyi were "interacting with" Greenough "on occasion" about Maryland study); id. at 38:3-39:2 (knew Strobos consulted his wife for her expertise about Rx100).

The record confirms, too, that others involved in these interactions thought these consultations were part of Strobos's work on behalf of the Company. In one email to higher-ups at RxBio, including McCool, for example, Strobos plainly stated that "Nisha [Chandra-Strobos]

is reviewing [the attached detailed annual report on Rx100] as well." ECF No. 23-9, Exh. 24 (Email from Strobos on Oct. 19, 2014). No one at RxBio, at least in the record, ever objected at the time to these revelations or raised any cause for concern. On the contrary, McCool himself affirmed in his testimony on behalf of the Company that he thought that it made good sense for Strobos to consult his well-regarded wife on issues within her expertise. See McCool Dep. at 46:19-23. As to Greenough, moreover, at least one other RxBio employee actively participated in the consultations with him, offering up technical details about Rx100 in the hopes of soliciting his expert advice. See Tigyi Dep. at 58:2-20. These communications thus have all the hallmarks of a regular business consultation. In short, the record speaks with one voice in demonstrating that they all occurred within the confines of Strobos's efforts to fulfill his duties as its Vice President of Clinical Research.

This claim, moreover, fails for yet a third reason. Here, again, the Company has identified no injury or damages that arose from Strobos's actions. See Cardiovascular Support Perfusion Reliance Network, LLC v. SpecialtyCare, Inc., 629 F. App'x 673, 678 (6th Cir. 2015) (affirming summary judgment where no evidence of damages from alleged breach of nondisclosure agreement). Rather, the record contains uncontroverted evidence that RxBio benefited significantly from these conversations as it sought to address the problematic findings of the Maryland study. See Tiygi Dep. at 43-44, 55-58. In particular, these conversations helped the Company critique the methodology used by the Maryland researchers, which led to a new study that got better results as to Rx100's efficacy. Id. This information was also successfully used in a bid by the Company to secure additional funding from another government agency for the drug's development. See RxBio SOI, ¶ 56 (failing to point to evidence contradicting this

fact).  If anything,  then,  the record indicates  that RxBio reaped significant  advantages from these

talks.

The Company,  in response on this point,  counters only that it <u>could</u> be damaged in the

future, should  Greenough or Chandra-Strobos  share this information  about the Company's  work

with others.  <u>Id.</u>, ¶ 91.  But these future damages are entirely speculative and, accordingly,

insufficient  to avoid  summary judgment.  <u>Rye</u>, 477 S.W.3d at 266.  The Company also conceded

in its testimony  that it has never sought  any nondisclosure  agreement from either outside

clinician  since, and that it has no reason to believe  that at least one of them will  ever share any

proprietary  information  to its detriment.  <u>See</u> McCool Dep. at 49:14-50:13  (acknowledging  he

has no "reason  at this point  in time to believe that" Greenough  "used any information  he received

from RxBio other than to assist RxBio" in its efforts to address the implications  of the Maryland

study).  No reasonable  juror could conclude  based on the evidence  in the record that the

Company  sustained  any damages on this claim.

For all these reasons, Strobos  is entitled  to summary judgment  to the extent that this

counterclaim  seeks to rely on his alleged breach of the 2014 Employment  Contract.

2.  *TUTSA*

All is not yet lost, however, as RxBio also advances a second theory of liability  on this

count – namely, under TUTSA.  For such a misappropriation-of-trade-secrets  claim,  it must

prove: "(1) the existence of a trade secret; (2) misappropriation  of the trade secret by [Strobos];

and (3) resulting  detriment  to the [Company]."  <u>PartyLite Gifts, Inc. v. Swiss Colony Occasions</u>,

2006 WL 2370338,  at *3 (E.D. Tenn. Aug. 15, 2006) (collecting  cases).

Although  the Company  makes little  effort to show that the information  Strobos shared

was even a trade secret – largely  just listing  off a series of emails and descriptions  that he sent to

Dr. Chandra-Strobos at various times during his employment and identifying nothing at all in relation to Dr. Greenough – it most clearly fails on the second and third elements of its claim. See Cross-Mot. at 23-24. Under TUTSA, a "misappropriation," as relevant to the circumstances here, is statutorily defined as the "disclosure . . . of a trade secret of another <u>without express or implied consent</u> . . . [where the discloser] knew or had reason to know that its knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Tenn. Code § 47-25-1702(2)(B) (emphasis added). Critically, the party bringing this claim must prove that the misappropriation occurred without its consent to the disclosure. See <u>Trident Prods. & Servs., LLC v. Canadian Soiless Wholesale, Ltd.</u>, 859 F. Supp. 2d 771, 780 (E.D. Va. 2012), <u>aff'd</u>, 505 F. App'x 242 (4th Cir. 2013); <u>see also</u> <u>Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.</u>, 157 F. Supp. 3d 407, 424 (D.N.J. 2016).

As explained above, however, the record shows that the Company, at the very least, implicitly consented to the sharing of information that it alleges Strobos disclosed. <u>See, e.g.</u>, McCool Dep. at 48:8-49:13 (acknowledging he knew Strobos and Tigyi were consulting Greenough and conversations were intended to provide "[m]eaningful input" on project); <u>see also id.</u> at 42:20-21, 45:3-24; ECF No. 23-9 (Emails on Oct. 29, 2014) (multiple RxBio employees responding without objection to email from Strobos of detailed Rx100 report, the original of which declares, "[Chandra-Strobos] is reviewing as well."). Strobos asked Chandra-Strobos, in particular, to consult on a variety of technical issues related to Rx100 throughout his tenure because she is a "nationally recognized physician with tremendous academic and clinical expertise" who serves as the chair of cardiology at Johns Hopkins Bayview Hospital. <u>See</u> RxBio SOI, ¶ 31. To the same end, CEO McCool testified that he knew Strobos planned to consult Greenough on how to interpret and deliver the results of the Maryland study to another

government funder because Strobos "thought that he might be able to provide [meaningful] input" in this regard. See McCool Dep. at 48:8-19.

Strobos, as the Company's sole vice president, was given tremendous leeway to set such a course for the Company as to these issues. In fact, McCool testified that Plaintiff was essentially in charge of the regulatory side of figuring out how to wrest approval from the government for Rx100's use on humans, and he often entrusted Strobos to troubleshoot what needed to get done without paying much attention to the details of how the sausage was being made. Id. at 28:22-29:17, 45:16-46:17. McCool further explained that issues like those addressed by Strobos to Greenough were "not something [he] spent much time with," though he knew the outside clinician was being engaged by the Company to advance its interests in this regard. Id. at 48:16-49:7. McCool likewise knew that Strobos and another high-ranking RxBio employee held at least one teleconference with Greenough about Rx100 and that they otherwise interacted with him "on occasion." Id. at 48:8-13. As McCool later explained, moreover, Strobos "guided this boat. [He had] been the principle architect" of the Company's strategy on these matters. Id. at 140:19-22. There is no evidence that RxBio ever sought to restrain Strobos's unfettered discretion on charting such a course either.

In other words, all evidence points to the fact that Strobos was driving this aspect of RxBio's business, had permission to do so, and consulted these outside clinicians solely to this end. There is certainly no indication, by contrast, that either Chandra-Strobos or Greenough had any other interest in Rx100 – i.e., they were not working for competitors or trying to develop a similar product. McCool, in fact, testified that he was not worried about these interactions at the time as he had no reason to believe that Greenough "used any information from RxBio other than

to assist RxBio." Id. at 49:10-19. The Company has, moreover, provided no evidence since to indicate that things have now changed on this score.

Instead, it concedes that it knew Strobos was sharing this information, but "maintains [in its Reply] that its knowledge that Dr. Strobos was sharing proprietary trade secrets with persons outside of RxBio is not tantamount to consent to do so without adequate confidentiality agreements or other mechanisms for protecting and preserving the information." RxBio Reply at 21. It offers no further legal argument or citation to case law, though, to support the assertion that its documented acquiescence in numerous emails and conversations should somehow be considered contingent on an assumption that Strobos would have already sought confidentiality agreements; nor does it provide a reasonable factual basis for such an assumption. It certainly never contends, for example, that it asked him to secure these agreements or that it had any written Company policy requiring him to do so.

An implicit requirement would also stand in tension with the Company's documented failure to even approach Greenough or Chandra-Strobos subsequently to seek a nondisclosure agreement, see McCool Dep. at 49:20-50:13, not to mention the delay it took in securing a written and binding contract with a nondisclosure provision from Strobos himself. As a refresher, the Company concedes that it did not sign any written employment contract with Strobos until 2014. It then backdated that contract to 2011. See, e.g., id. at 13:22-14:6 (in response to question about the terms Strobos worked under prior to 2014, McCool testified that "he was working under sort of a verbal agreement, I guess, as much as anything else"). As McCool testified, this oversight reflected that the Company simply "forgot" to sign the contract with Strobos until he was several years into his work for it. Id. at 19:6-8 ("What was the impetus for signing the 2011 Employment Agreement in 2014? We forgot to do it in 2011."). It did not

18

even realize this error, moreover, until <u>BARDA</u> asked for the agreements, leading it to discover that it did not have such contracts in place for CEO McCool, Vice President Strobos, <u>or</u> its Chief Operating Officer. <u>Id.</u> at 22:7-14.

Given these omissions, whatever the industry best practices, the record in this case gives no indication that the Company prioritized the signing of such nondisclosure agreements before the acquisition of information about its Rx100 work. These facts, taken together, would prevent any reasonable juror from concluding here that RxBio did not at least impliedly consent to Strobos's actions in consulting these outside clinicians on matters intended to help move Rx100 forward during his tenure. RxBio, in short, has raised no more than an unsupported denial on this point. <u>Celotex</u>, 477 U.S. at 324.

In addition, this count suffers from the same damages deficiency identified in regard to the breach-of-contract theory. In other words, there is again no evidence that Strobos shared any information with either Greenough or Chandra-Strobos to the Company's detriment. <u>PartyLite</u>, 2006 WL 2370338, at *3 (specifying "detriment" as third element of TUTSA claim). There is nothing in the record to indicate that Greenough or Chandra-Strobos used this information for any purpose other than to provide assistance to RxBio about its Rx100 project. McCool, in relation to at least one instance, in fact, testified that he knew Dr. Chandra-Strobos had reviewed detailed slides that RxBio used to present its work to BARDA, as she might hold expertise that would be helpful to the Company. <u>Id.</u> at 38:24-39:9. Likewise, he attested that he had no reason either then or now to believe Greenough might use the information for anything other than to help the Company, as already mentioned above. <u>Id.</u> at 49:10-19. No evidence suggests the contrary position that Greenough or Chandra-Strobos would have any other use for this information. There is most certainly no evidence to suggest that they have used it for <u>any</u>

purpose or that the referenced information held any economic value for these clinicians. No basis appears, therefore, upon which RxBio could recover damages under TUTSA.

The Court will thus grant summary judgment to Strobos on this count.

*     *     *

For a final tally, then, the Court denies summary judgment to Defendant on all its counterclaims and grants summary judgment to Plaintiff on all of these causes of action except Count I (full time and attention).

### C. Strobos's Claims

Shifting now to the original suit itself, Strobos seeks various pots of money that he believes the Company unjustly refused to pay him after he resigned. Although he separates these between a breach-of-contract claim as to all of these sums (Count I) and a statutory claim as to the wages (Count II), the Court breaks up its treatment based on the three types of payouts at issue – unpaid out-of-pocket expenses, accrued wages and bonuses, and severance pay.

#### 1. *Out-of-Pocket Expenses*

The facts underlying this portion of Strobos's breach-of-contract claim are not in dispute. Under Article VIII of the 2014 Employment Contract, RxBio committed to "reimburse [him] for all reasonable, ordinary, necessary, and documented out-of-pocket expenses properly incurred in the course of the performance of [his] duties and responsibilities." As the Company concedes, at the time that he resigned from RxBio, it had not yet reimbursed him $16,288.89 in such expenses. See RxBio SOI, ¶ 76; see also ECF No. 11, Exh. C (Letter from McCool to Strobos on Sept. 14, 2015). It thus began repaying him at a rate of $1,000 per month until he filed this lawsuit. See RxBio SOI, ¶¶ 76-77. At that time, RxBio ceased making these payments, contending that it had a right to "offset" any amount he might eventually owe on its

counterclaims against the $9,383.41 in expenses still owed to him. Id.; Strobos Reply at 3 n.3 & Cross-Mot. at 42 (agreeing as to remaining amount).

The Company now maintains that judgment should not be entered on this claim for the same reason, and it appears to make no further affirmative case that judgment should be entered in its favor. See Cross-Mot. at 42 ("RxBio does not dispute that, subject to the offset provision, Dr. Strobos would be entitled to reimbursement for certain expenses incurred in the course of his employment. RxBio has never disputed this fact."). But the contract provision upon which it claims this right to offset says nothing about any potential future liabilities. Id. (citing 2014 Employment Contract, art. VI). Instead, it provides: "<u>At the time</u> any amount would otherwise be due to [Strobos] pursuant to this Agreement, [RxBio] may offset any amounts that [Strobos] <u>owes</u> to [RxBio]." 2014 Employment Contract, art. VI (emphasis added).

As Strobos does not currently owe RxBio any money, at least none that it has identified or provided evidence to support, he is entitled to summary judgment on this count. If, as the Company hopes, he ends up owing it more than it owes him, the final judgment in this case will reflect as much. That question, however, does not go to whether RxBio previously breached its obligation to reimburse him for expenses and thereby caused him damage – *i.e.*, the essential elements of his claim. As to these material issues, in fact, it raises no objection. There is thus no genuine issue left to resolve at trial on this portion of his claim.

### 2. *Wages and Bonuses*

Strobos next asserts that RxBio violated his contract and the D.C. Wage Payment and Collection Law, D.C. Code § 32-1301 *et seq.*, when it failed to pay his accrued wages and bonuses in a timely manner. The parties agree that these accrued amounts eventually totaled $263,461.20 by the time of his departure. See, e.g., ECF No. 11, Exh. C (Letter from McCool to

Strobos on Sept. 14, 2015) at 1 (conceding the amounts accrued). The Court first takes up his contract theory and then turns to his statutory one.

a. Breach of Contract

As a reminder, under Tennessee law, Strobos must prove three elements for this breach-of-contract claim: "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." Custom Built Homes, 1998 WL 960287, at *3. RxBio neither disputes that the 2014 Employment Contract setting out his salary and bonuses is enforceable nor objects to the fact that he was damaged as a result of their withholding.

Defendant does, however, vigorously dispute whether it breached that agreement when it stopped paying the full amount of his salary and bonuses each month. While Strobos concedes that he worked out a verbal deal with McCool to accrue the unpaid portions of his salary on the Company's books beginning in September 2014, see RxBio SOI, ¶ 42, he believes that this amendment failed to create a new binding contract under Tennessee law because it lacked a necessary term – *i.e.*, "an objective, determinable date when payment of [his] withheld wages would occur." Mot. at 13. Put another way, he contends that the parties never successfully agreed to defer payment of his salary, and the Company was thus in breach of the original 2014 Employment Contract the instant it stopped paying him at the rate of $385,000 a year.

This argument does not pass muster. As an initial matter, most of the cases that Strobos cites are easily distinguished from the circumstances involved here. In Jamestowne on Signal, Inc. v. First Federal Savings & Loan Association, 807 S.W.2d 559 (Tenn. Ct. App. 1990), for example, the court held that an oral loan agreement was unenforceable because it lacked "any of the essential elements of such a loan, such as the amount to be loaned, the duration of the loan,

how it was to be repaid, the rate of interest to be paid and when, [and] what security, if any, was to be given." Id. at 564-65; see Peoples Bank of Elk Valley v. ConAgra Poultry Co., 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991) (holding no enforceable contract where parties failed to specify any essential terms).

In this case, by contrast, if RxBio's version of the facts are to be believed, the deal between Strobos and McCool was not so indefinite. McCool testified that they agreed at the time that payment of his accrued salary would come due when (and if) the Company secured a significant outside funding source to replace the lost BARDA sums. See Letter from McCool to Strobos on Sept. 14, 2015; McCool Decl., ¶ 58. This, RxBio asserts, has not yet happened as its settlement with BARDA paid only a "portion of the monies withheld," and no other "significant funding from another source" has yet to appear on the scene. See McCool Decl., ¶ 59. Crediting this evidence as believable and drawing all reasonable references from it, as the Court must at this stage, the revised wage agreement between McCool and Strobos thus lacked a settled future date when payment would come due, but that date was not indiscernible or indefinite. Rather, it was squarely fixed by a run-of-the-mill condition precedent that the Company first receive adequate replacement funding. In essence, then, this new deal specified both the amounts to be paid – the total salary and bonuses logged on the books – and set an identifiable event linked to when that payment would have to occur. It was not, as Strobos contends, an agreement where the essential terms of the deal were left too indefinite to be pinpointed. Cf. Four Eights, LLC v. Salem, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005) (holding no enforceable agreement where no price was set and parties merely made an "agreement to agree" on one in future).

This is especially so given that Tennessee law disfavors holding agreements unenforceable for lack of a definite term. See, e.g., German v. Ford, 300 S.W.3d 692, 706

(Tenn. Ct. App. 2009) ("[A] finding that a contract is sufficiently definite is favored, so as to carry out the reasonable intentions of the parties."). Courts instead "seek to avoid finding that an agreement is too uncertain to be enforceable by considering the surrounding circumstances and the conduct of the parties." Id. Here, as the undisputed facts make clear, Strobos went along for nearly a year with the plan to defer payment of a portion of his salary. It was not until he left RxBio that he began demanding immediate payment of these sums. The "surrounding circumstances and the conduct of the parties," as a result, strongly cuts in favor of concluding that Strobos and McCool entered into some sort of binding deal to defer payment of a portion of his original salary beginning in September 2014.

A critical remaining factual question remains, of course, as to whether, as Strobos contends, any such contingency is now satisfied. More specifically, he asserts that payment is now due on even RxBio's version of the deal because the terms of the condition precedent were satisfied once BARDA released some of the withheld funds. RxBio, by contrast, claims the contingency hinged on securing a fully equivalent funding replacement instead, which, it asserts, did not encompass such a partial payment. Resolving this issue will hinge on what the factfinder ultimately concludes was the precise parameter of their September oral agreement. The Court, accordingly, denies summary judgment to either party on this claim.

b.    D.C. Wage Payment and Collection Law

Strobos next posits that his wages and bonuses are nevertheless due in full under the District of Columbia's Wage Act because that law requires those employed in the District to receive all wages and bonuses due at least monthly. See Mot. at 11 (citing D.C. Code §§ 32-1301, 32-1302); see also Pleitez v. Carney, 594 F. Supp. 2d 47, 48 (D.D.C. 2009) (explaining bonuses qualify as "wages" under former version of D.C. Code § 32-1301). According to him,

24

this requirement "may not be waived by private agreement," Mot. at 11 (citing D.C. Code § 32-1305), and applies to his accrued salary and bonuses, as he contends that he predominantly worked for RxBio from an office in the District. Id. (citing Am. Counterclaim, ¶ 6). In support, he also notes that the Company agreed to pay for his office space in the District under the 2014 Employment Contract. Id.

As a preliminary matter, the Company correctly points out that Strobos cannot rely on this statute for around half of the wages that he seeks to collect in this action. This is because the Act expressly exempted executive and professional employees from its protections until the Wage Theft Prevention Amendment Act of 2014 amended its scope on February 26, 2015. See Wage Theft Prevention Amendment Act of 2014, Law 20-157 (Act 20-426) (approved Sept. 19, 2014; effective Feb. 26, 2015). There is no question that Strobos was such an exempted executive, as he served throughout his tenure as the Company's sole Vice President. See, e.g., RxBio SOI, ¶ 25 (conceding that he was such an employee). Indeed, the very basis for his claim to severance pay is that some of his supervisory responsibilities were unfairly curtailed prior to his departure from the Company. He therefore cannot invoke this law for at least the $127,233.37 in salary and bonuses that stemmed from his work in 2013 and 2014, as well as any pro rata portion of the $136,227.83 in 2015 that should have compensated him for his work prior to February 26, 2015. See Mot. at 9 (specifying amounts due).

To resist this straightforward conclusion, Strobos argues only that the Wage Theft Prevention Amendment Act of 2014 requires that all of the wages that he had previously earned came due once the law was broadened to include employees like him. See Strobos Reply at 10-11. Put another way, he essentially seems to contend that the revised statute's requirement that

he be paid monthly for "all wages earned" should be interpreted to include the already accrued wages for work that he had done prior to its amendment. Id.

Under D.C. law, however, no retroactive effect is given to a statute "unless the legislative purpose to do so plainly appears." District of Columbia v. Gallagher, 734 A.2d 1087, 1093 (D.C. 1999) (quoting United States v. Magnolia Petrol. Co., 276 U.S. 160, 163 (1928)); see Landgraf v. USI Film Prod., 511 U.S. 244, 270 (1994) ("Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent."). As one district court in this Circuit has already concluded, the Wage Theft Act contains no such indicia of retroactivity. See Escobar Iraheta v. Magic Meals, Inc., 201 F. Supp. 3d 172, 175 (D.D.C. 2016), vacated on other grounds, 2017 WL 1086625 (D.D.C. Feb. 22, 2017) (due to settlement). Plaintiff, moreover, certainly points to no indicia here and this Court finds none.

As to the remainder of the 2015 salary that RxBio continued to accrue on its books for Strobos after February 26, the Court concludes that summary judgment is inappropriate for either party based on the current record. In particular, the D.C. Wage Act only applies to "employers" who "employ[] any person in the District of Columbia." D.C. Code § 32-1301(1B). The parties hotly contest whether Strobos, by this time, was in fact so employed. As the Company points out, while he may have chosen to work predominantly from his offices in the District on matters for the Company, by 2015 it was no longer paying for that workspace. See McCool Dep. at 192:3-19; McCool Decl., ¶ 41. RxBio, moreover, was in Tennessee, and it maintains that Strobos held an office there throughout his tenure, as well as at his Maryland home. See McCool Decl., ¶¶ 43-44. The record is thus not clear as to when D.C. law would apply.

Perhaps even more critically, the Act requires that an employer only pay the sums undisputedly "due" at the end of each month. See D.C. Code § 32-1304 (providing for delay in payment where some amount is contested). But, as previously explained, the parties here seem to have agreed that some portion of Strobos's salary would no longer be "due" until a condition precedent first obtained, and neither side explains whether these wages continued as a result to truly come "due" by the terms of their September deal. Strobos and McCool certainly treated them as though they did not for nearly a year. Other employees, too, testified that Strobos knew that these accrued liabilities might never be repaid and advised them to plan their own futures accordingly. See Thompson Decl. at 2; Boler Decl. at 2. Indeed, it appears from the record that Strobos did not began disputing whether his salary and bonuses were now immediately ripe for payment until he left the Company.

As a result of these sparring factual positions, the Court cannot conclude that either party has shown an entitlement to summary judgment on the remainder of this count.

### 3. *Severance*

In his last claim, Strobos seeks to collect $427,950.01 in severance pursuant to Article XI of his 2014 Employment Contract. See Mot. at 17; Strobos Reply at 12. That provision, as relevant here, states:

> If [Strobos] is terminated by [RxBio] without Cause or [Strobos] resigns for Good Reason, all as defined in Article XIX of this Agreement, [RxBio] shall pay [Strobos], as a single severance payment, the sum of one year's base salary and prior year's bonus.

The Contract then defines "good reason" as including "a material change in [Strobos's] reporting relations or a material reduction in duties without employee's prior written consent." Id., art. XIX, § 19.6, at 8. According to Strobos, McCool satisfied this condition when he began unilaterally reassigning his supervisory duties to others on June 30, 2015. See Mot. at 17-18.

These actions, by his telling, eventually forced his July 17 Resignation Notice to McCool, which McCool later accepted. Id.

The facts in the record, though, are again not so clear cut. On Strobos's side of the equation, his Resignation Notice to McCool did reference specific examples of changes in his responsibilities that he felt substantially altered his established role in the Company – namely, by assigning communications with certain federal agencies to other RxBio employees. See ECF No. 41-28, Exh. BB (Resignation Notice) at 1 ("I no longer bear responsibility for communication with, document development for, or submission of reports to all federal agencies and for directing and supervising employees responsible for assisting in those efforts."). But RxBio, in rebuttal, provides its own evidence that Strobos's duties were never so broad as his email contends, but were instead limited to interactions with only specific government agencies. See McCool Decl, ¶ 149. McCool, furthermore, wrote back to Strobos, classifying his resignation as "voluntary" and notifying him that he did not believe severance would thus be due. See ECF No. 41, Exh. CC (Letter from McCool to Strobos on July 17, 2015) at 2.

Given these conflicting renditions of the events that led to Plaintiff's departure from the Company, the Court cannot at this juncture grant summary judgment to either side and will again deny both Motions on this count.

*       *       *

In sum, the Court will deny both sides' Motions as to Strobos's causes of action with the exception of its partial grant of summary judgment to Plaintiff on Count I (out-of-pocket expenses).

D.  Strobos's Motion to Strike

One last issue must be briefly resolved before this case marches off to trial. After RxBio docketed its Reply, Strobos filed a Motion to Strike it on the ground that the Company had attempted "to introduce new evidence" by attaching a supplemental declaration from McCool to its brief. See ECF No. 51. More specifically, Strobos objected to the novel justification presented in that new exhibit for RxBio's failure to repay his expenses. Id. As the Court has now rejected the Company's argument on this score, it will now deny this Motion to Strike as moot.

## IV.    Conclusion

For the reasons stated herein, the Court will largely deny both Motions for Summary Judgment. As to RxBio's Counterclaim II, III, and IV, as well as to Strobos's contract claim for expenses, however, it will grant Plaintiff's Motion. Finally, it will deny as moot Strobos's Motion to Strike. A contemporaneous Order will so issue.

/s/ <i>James E. Boasberg</i>
JAMES E. BOASBERG
United States District Judge

Date: May 9, 2017